## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JEFFERY DROBNICK, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  08 C 0164 |
| | ) | |
| v. | ) | Judge Lindberg |
| | ) | |
| TRICAM INDUSTRIES, INC., | ) | Magistrate Judge Nolan |
| | ) | |
| Defendant. | ) | **JURY DEMAND** |

## REQUEST FOR ADMISSION PURSUANT TO RULE 36(a)

NOW COMES the Defendant, TRICAM INDUSTRIES, INC., through undersigned counsel of record, and requests that Jeffery Drobnick admit that Exhibit 1 accurately states the questions asked and responses given during Mr. Drobnick's statement given in the presence of his attorney on September 21, 2007.

Respectfully Submitted,

TRICAM INDUSTRIES INC.

/s/ Paul V. Kaulas

Paul V. Kaulas
Attorney No. 6184224
Attorney for Defendant, Tricam Industries, Inc.

Paul V. Kaulas
McVey & Parsky, LLC
30 N. LaSalle St., Suite 2100
Chicago, IL  60602
Phone: (312) 551-2130
Fax: (312) 551-2131
Email: pvk@mcveyparsky-law.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to: Louis W. Brydges, Law Offices of L.W. Brydges, Sr., 35973 North Helendale Road, Ingleside, Illinois 60041, by regular mail on January 15, 2008.

McVEY & PARSKY, LLC
Attorney for Defendant
30 North LaSalle Street
Suite 2100
Chicago, IL 60602
Tel: (312) 551-2130
Fax: (312) 551-2131


By: /s/ Paul V. Kaulas
      Paul V. Kaulas
      Illinois Bar No. 6184224

Page 1

1   STATE OF ILLINOIS       )

2                           )   SS:        **ORIGINAL**

3   COUNTY OF L A K E        )

4   CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT

5                LAKE COUNTY, ILLINOIS

6

7   JEFFERY DROBNICK,            )

8           Plaintiff,           )

9      vs.                       ) No. 07 L 955

10  TRICAM INDUSTRIES,           )

11          Defendant.           )

12

13      RECORDED STATEMENT of JEFFERY DROBNICK, taken

14  by MR. MARK PARSKY on 21st of the September,

15  2007.

16

17

18

19

20

21

22

23  Transcribed By: MARLO RODRIGUEZ, CSR, RPR

24  License No.: 084-004254


EXHIBIT
1

Page 2

1          MR. PARSKY:  Today's date is September 21,

2     2007.  We are at the home of Jeff Drobnick.  And

3     we are going to take his recorded statement

4     today.  Mr. Drobnick is represented by counsel,

5     Louis Brydges.  Also present is Brandon Shoe.

6     I'm Mark Parsky.  I am an attorney for Tricam

7     Ladders.  First of all, Mr. Drobnick and counsel,

8     we have permission to record today's statement?

9          MR. BRYDGES:  Yes.

10          Do any of you have a card with you?

11          MR. PARSKY:  I do.

12                    EXAMINATION

13     BY MR. PARSKY:

14     Q.   Mr. Drobnick, for the record, what's

15     your date of birth?

16     A.   9-9-66.

17     Q.   What is your height?

18     A.   Roughly 5'6".

19     UNKNOWN SPEAKER:  I just want to make sure

20     this is working here.  Hold on one second.  Good

21     to go.

22          MR. PARSKY:  We are back on.  We were

23     checking to make sure the recorder was working.

24

Case 1:08-cv-00164  Document 5-2  Filed 01/15/2008  Page 5 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 3

1    BY MR. PARSKY:

2        Q.    What was your approximate weight on the

3    date of your accident with the ladder?

4        A.    **Roughly around 150.**

5        Q.    What do you do for a living?

6        A.    **Builder-developer.**

7        Q.    Over the years, have you used ladders

8    with regularity?

9        A.    **Yes, I have always used ladders.**

10       Q.    In conjunction with your work?

11       A.    **Yes.  And around the household stuff.**

12       Q.    In what capacity have you used ladders

13   as part of your work?

14       A.    **Getting up onto the next levels that**

15   **don't have stairs in them yet.  Are you talking**

16   **about personally for myself?**

17       Q.    For yourself and on the job.  Right, I'm

18   saying for yourself personally, yes.

19       A.    **Just getting up and making sure things**

20   **are done on different levels because like I said**

21   **there's no stairs maybe in the house yet.**

22   **Getting down to the basements that don't have**

23   **stairs to make sure all of the construction is**

24   **going properly.**

Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 4

1    Q.    And over the past 20 or so years, what

2    types of things have you used ladders to do

3    around your residence?

4    **A.    Christmas lights, light bulbs in the**

5    **house, putting pictures up, normal regular**

6    **household duties.**

7    Q.    As of the date of your ladder accident,

8    would you say that you were an experienced user

9    of ladders?

10    **A.    Yes.**

11    Q.    As of the date of your accident, you

12    understood how to use ladders?

13    **A.    Yes, I did.**

14    Q.    Who purchased the ladder involved in

15    your accident?

16    **A.    I purchased it.**

17    Q.    When did you buy it?

18    **A.    I can't give you an honest answer on**

19    **that.  It's been quite a few years.  It's hard to**

20    **say.  I have bought so many ladders over the**

21    **years.  When I go to the hardware store and I see**

22    **a deal on a ladder, if I need one, I will buy it**

23    **if it's a good deal because then we use them on**

24    **job sites.  I leave them there for my workers**

1    sometimes or myself.

2        Q.    The ladder appears to have been

3    manufactured in 2003 --

4        MR. BRYDGES:   2003?

5        MR. PARSKY:   2003.

6        MR. BRYDGES:   Oh, 2000, okay.

7    BY MR. PARSKY:

8        Q.    Does that sound reasonably close to the

9    time frame that you bought the ladder?

10       A.    I'm sure it was somewhere around there.

11       Q.    Where did you buy the ladder?

12       A.    It had to be one of three stores.   It

13   had to be either Home Depot, a Sears or an Ace.

14       Q.    Do you remember specifically why you

15   would have bought this ladder?

16       A.    For household stuff or job sites to get

17   up on different levels if they are small to carry

18   in my truck because I don't have a big truck.

19       Q.    In looking at the ladder today, there

20   are multiple overspills of paint and various

21   substances on the ladder?

22       A.    Yes.

23       Q.    Was this ladder used on a job site or

24   job sites?

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 8 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 6

1      A.    It's been used in my personal home

2    painting wise.  It could have been used on the

3    job site.  I couldn't guarantee that.

4      Q.    So maybe yes, maybe no?

5      A.    Right.

6      Q.    When we talk about a job site, what type

7    of job site are we talking about?

8      A.    That ladder would have been used for

9    like drywall -- touch up on drywall mud,

10   painting.  I built the house we are in.  And this

11   -- and that ladder has been used here for doing

12   drywall and crack settling and painting.

13     Q.    How old is this house here?

14     A.    This house was built started in 2004,

15   finished in 2005 in I believe it was May or June.

16     Q.    So the ladder in question could have

17   been here while this home was being built?

18     A.    Yeah.  Or it could have been at my last

19   house I built before this one too.

20     Q.    I take it if the ladder was here while

21   this house was being built, it could have been

22   used by yourself and it could have been used by

23   various tradesmen who were building the house?

24     A.    Right.  But the ladder was -- that type

Case 1:08-cv-00164   Document 5-2   Filed 01/15/2008   Page 9 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 7

1    of ladder would not have been in here.  It was at

2    the drywall stage when we were doing painting and

3    stuff.  This isn't the type of ladder my

4    construction guys were going to stand on to lift

5    heavy stuff.

6         Q.   At the drywall stage, what type of work

7    would be performed with a ladder such as the

8    ladder involved in your accident?

9         A.   Just normal painting.

10        Q.   What about the installation of drywall?

11        A.   No.  My drywall guys used all of their

12   scaffolding and all that.  They have all of their

13   own equipment.  I could provide them basically

14   when we are custom painting where, you know, you

15   can't just roll the walls.  You have to color the

16   walls to the ceiling, cut it out to the ceiling.

17        Q.   Is it safe to say that your ladder had

18   been used for perhaps two years on a regular

19   basis prior to the date of your accident?

20        A.   I would say not consistently.

21        Q.   Prior to the date of your accident, had

22   anyone ever complained about the performance of

23   that ladder?

24        A.   No.

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 10 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 8

1     Q.   Had you yourself personally used the

2  ladder prior to the date of your accident?

3     A.   Yes.

4     Q.   Did you yourself have any problem

5  whatsoever with the ladder prior to the date of

6  your accident?

7     A.   No.

8     Q.   Can you estimate the number of times

9  that you used that particular ladder prior to the

10  date of your accident, by that I mean, the number

11  of occasions where you took it out and climbed up

12  and down?

13     **A.   When we moved in there, probably several**

14  **times doing wall hangings and stuff like that.**

15     Q.   Would it be safe to say that you used

16  the ladder in question more than ten times prior

17  to the date of the accident?

18     A.   Yes.

19     Q.   More than 20 times?

20     A.   Yes.

21     Q.   It's also safe to say that other

22  painters and tradesmen used your ladder prior to

23  the date of accident?

24     **A.   Minimum.  It was mostly done in this**

Case 1:08-cv-00164    Document 5-2    Filed 04/15/2008    Page 11 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 2-1-07)

Page 9

1    house I'm sure.  We have repainted these walls

2    several times, different times.

3       Q.    Prior to the date of your accident, did

4    the ladder ever shake, wobble or feel unsteady?

5       A.    Not that I'm aware of.

6       Q.    Prior to the date of your accident, did

7    you have reason to believe that there was

8    anything wrong with that ladder?

9       A.    No.

10      Q.    As an experienced ladder user, did you

11   understand the importance of maintaining your

12   balance while on a ladder?

13      A.    Yes.

14      Q.    As an experienced ladder user, did you

15   know that you are not supposed to overreach while

16   on a ladder, and by overreaching, I mean reaching

17   too high, too low or too far to your right or

18   left?  You got to say yes.

19      A.    Yes.

20      Q.    And why don't you want to overreach on a

21   ladder?

22      A.    Because I don't want to fall off the

23   ladder.

24      Q.    On the date of your accident, did you

```
 1    understand that a ladder such as the one you were

 2    using needs to be set up on a firm, level

 3    surface?

 4         A.    Yes.

 5         Q.    And why is that?

 6         A.    To keep the thing sturdy.

 7         Q.    As of the date of your accident, did you

 8    understand that you are not supposed to use a

 9    ladder that's damaged or broken?

10         A.    Yes.

11         Q.    As of the date of your accident, did you

12    understand that you are not supposed to step on

13    the top cap of the ladder?

14         A.    Yes.

15         Q.    The top cap is the very top step?

16         A.    Yes.

17         Q.    And why do you not want to stand on the

18    top cap?

19         A.    Because the directions say don't stand

20    on it.

21         Q.    As of the date of your accident, did you

22    understand that you are not supposed to stand on

23    the step immediately below the top cap?

24         A.    Yes.
```

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 13 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 11

1      Q.   And why do you not want to stand on the

2  step immediately below the top cap?

3      A.   **Just my thing is to make sure it doesn't**

4  **collapse, sturdy wise.**

5      Q.   During your use of the ladder before the

6  date of your accident, how high up had you

7  climbed?

8      A.   **On other job sites?**

9      Q.   Not on other job sites, but with this

10  particular ladder when you used it before the day

11  of the accident, you know, for whatever you were

12  using it for, how high up had you climbed on

13  those occasions at the highest point?

14      A.   **Probably to about right here.**

15      Q.   Would that be the fourth step?

16      A.   **I don't know how many steps it has on**

17  **it.**

18      Q.   The ladder has six steps and the sixth

19  step would be the top cap --

20      A.   **I can't say any higher than the fourth.**

21      Q.   Okay.  Had you climbed up to the fourth

22  step before the day of your accident when using

23  the ladder?

24      A.   **I'm sure I have.**

Page 12

1     Q.   No problems?

2     A.   No.  You see I'm under -- I'm not

3  overweight for the thing.  It says 325 pounds.

4     Q.   What task were you using the ladder to

5  do on the date of the accident?

6     A.   Hanging Christmas lights.

7     Q.   Where were you going to hang the

8  Christmas lights?

9     A.   Over my garage doors.

10    Q.   Was your first task that day to plug in

11  one end of the light?

12    A.   First task, yeah.  Then work my way

13  over.

14    Q.   We were just outside and we took a

15  couple pictures.  There is an outdoor plug

16  covered by a plastic cover; is that correct?

17    A.   Correct.

18    Q.   And the ladder was set up below that

19  outdoor plug; is that right?

20    A.   Correct.

21    Q.   And I believe -- well, when we were

22  outside before, you told us that the ladder was

23  set up with one of its sides nearest the wall or

24  the brick in between the two garage doors; is

Case 1:08-cv-00164   Document 5-2   Filed 01/15/2008   Page 15 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 13

1    that correct?

2        A.    Correct.

3        Q.    You can't remember whether it was the

4    right side of the ladder or the left side of the

5    ladder that was closest to the wall, but the

6    ladder was set up so you would walk up the steps

7    and you would turn?

8        A.    And lead straight up for the plug I

9    would be sure of (inaudible).

10       Q.    In other words, the ladder wasn't set up

11   such that the steps of the ladder were farthest

12   from the wall and the rear part of the ladder

13   that you don't climb up and down was closest?

14   The ladder was set up so that one of the sides

15   was nearest to the wall?

16       A.    Yes, as I recall, that's the way it was.

17       Q.    So you would have climbed up the ladder

18   and then made a short turn and then the plug

19   would have been there; is that correct?

20       A.    I don't know if I had to turn or not

21   because I had the ladder and you just open the

22   thing and plug it straight in because underneath

23   it was in the brick.  I can't remember if it was

24   in the brick or if it's underneath hanging in the

Page 14

1    soffit.

2        Q.    Describe how you set up the ladder that

3    day.

4        A.    Just like I do every time I open the

5    ladder.  I spread it out, make sure whatever you

6    call them things that go between the two ladder

7    pieces are down and that paint tray is down, make

8    sure it's sturdy before I get on it.

9        Q.    When an A-frame ladder such as the one

10   you were using is opened up, there are spreader

11   bars that connect to the front and the rear?

12       A.    Right.  That's what I'm talking about.

13       Q.    Okay.

14       A.    Those were locked in position.

15       Q.    When you say they were locked in

16   position, they were fully horizontal?

17       A.    Yes.

18       Q.    And how did you get the spreaders

19   horizontal?

20       A.    Same way I always do; open the ladder,

21   push -- make sure they are pushed down.

22       Q.    And they were pushed down?

23       A.    Yes.

24       Q.    And both spreader bars were horizontal?

Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

1    A.    Yes.

2    Q.    And was the paint tray down?

3    A.    Yes.

4    Q.    By down I mean the paint tray was also

5    horizontal?

6    A.    Yes.

7    Q.    What surface were you setting the ladder

8    up on?

9    A.    On the driveway.

10    Q.    What's the driveway surface?

11    A.    Asphalt.

12    Q.    What was the weather like on the day of

13    the accident?

14    A.    The weather was decent, dry.  It was

15    about 30-degrees, I think, 32.

16    Q.    There was no water or ice on the

17    driveway surface?

18    A.    No, there was not.

19    Q.    What were you wearing?

20    A.    Jeans, probably a sweat shirt, a

21    material type tool belt, not a real heavy one,

22    just to keep, you know, a screwdriver or anything

23    I need up there on my waist, just a cheap

24    material one to keep the clips in there or

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 18 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 16

1    whatever for the lights.

2        Q.    What kind of shoes were you wearing?

3        A.    Tennis shoes.

4        Q.    When you set up the ladder, did you make

5    sure that the front part of the ladder that you

6    climb up and down was directly in line with the

7    rear part of the ladder that you don't climb up

8    and down?  In other words, the ladder was not

9    cockeyed or off --

10       A.    It was not cockeyed, no.

11       Q.    Is that something you specifically look

12   for?

13       A.    I always make sure the ladder is secure

14   and tight.

15       Q.    Before you climbed the ladder, did you

16   look down at the feet of the ladder, the very

17   bottom, and observe that all four feet were flat

18   on the driveway surface?

19       A.    Yes, they were.

20       Q.    Would you have climbed the ladder if all

21   four feet were not flat on the driveway surface?

22       A.    No way.

23       Q.    Why not?

24       A.    Because I don't want to fall.  I see

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 19 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 17

1    people try to set ladders in the past on job

2    sites, you know, not on flat surfaces and I see

3    what happens.  I have been in the construction

4    management for 20 some years, so I have seen a

5    lot of stuff.

6        Q.    So making sure that all four feet were

7    flat on the driveway, that would have been

8    something you specifically looked for?

9        A.    Right.  And making sure those arms are

10   locked in position.

11       Q.    And when you look down at the ladder

12   feet, did you observe that if you drew lines

13   between the feet, it would form a rectangle, in

14   other words, the ladder was perfectly squared?

15   It was not cockeyed or lopsided?

16       A.    I never thought of drawing lines, but

17   they were all the way they were supposed to be.

18       Q.    Squared with each other?

19       A.    Uh-huh.

20       Q.    Would you climb a ladder if the front

21   section and the rear section were off --

22       A.    You mean like twisted?

23       Q.    Yeah.

24       A.    No.

Case 1:08-cv-00164   Document 5-2   Filed 01/15/2008   Page 20 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 18

1       Q.   And that would be something you look for

2    before you climb?

3       A.   Uh-huh.

4       Q.   You've got to say yes.

5       A.   Yes.

6       Q.   Did you make a stability check before

7    you climbed the ladder?  Some people, you know,

8    maybe grab the side rails or step on --

9       A.   To make sure it doesn't wobble?

10      Q.   Right.

11      A.   Yes, I did.

12      Q.   What did you do to make your stability

13   check?

14      A.   I just grabbed the ladder and see if it

15   wobbles.

16      Q.   And I take it it did not?

17      A.   It did not.

18      Q.   Felt firm?

19      A.   Uh-huh.  Yes.

20      Q.   You've got to say yes.

21      A.   Yes.

22      Q.   What did you have on your tool belt that

23   day?

24      A.   Just plastic clips for the lights.

1    Q.    What length did you intend to hang of

2    lights that day?

3    A.    Just the length of the garage.

4    Q.    And you were starting, I guess, really

5    we could say in the middle of the garage because

6    that's where the plug was?

7    A.    Correct.  Yes.

8    Q.    How high up the ladder did you climb?

9    A.    About 70 percent of the way,

10   three-quarters of the way roughly.

11   Q.    Let's say the very bottom step is step

12   number one and the one above that would be number

13   two and so on.  What step did you stop at?

14   A.    Probably number four.

15   Q.    That's step number four counting from

16   the bottom?

17   A.    Correct.

18   Q.    Were you able to get the lights plugged

19   in before your accident?

20   A.    Yes.

21   Q.    When you got to step number four, in

22   order to plug in the lights into the plug, did

23   you have to reach above your head, at head level,

24   at chest level?

Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-24-07)

Page 20

1    A.    I think it was about here, so a little

2    over my head or I honestly can't remember how far

3    my arm was without getting back on the ladder to

4    show me.

5    Q.    So you would have reached over your head

6    with your arm, you just can't recall how much?

7    A.    Right.

8    Q.    That means yes?

9    A.    Yes.

10    Q.    Let me ask you this, did you have to

11    fully extend your arm to reach the plug?

12    A.    I honestly can't remember.  Like I said,

13    if I did, I would extend my arm instead of going

14    up the ladder any farther.

15    Q.    Could you comfortably reach the plug

16    from the fourth step?

17    A.    Yes.

18    Q.    You didn't have to stretch onto your

19    tippy toes or anything like that?

20    A.    No.

21    Q.    In order to --

22    MR. BRYDGES:  Am I blocking the way for her

23    to get out?

24    THE WITNESS:  I don't know if she's leaving

1    now.   She will ask I'm sure.

2    BY MR. PARSKY:

3        Q.    In order to install the plug, did you

4    have to slide open a plastic cover?

5        A.    No.   The cover just opens on a hinge.

6        Q.    What type of physical movement is

7    required to actually install the lights into the

8    plug?   Is it just like plugging in a vacuum

9    cleaner?

10       A.    Just plug it right into the wall socket.

11       Q.    And you successfully did that before

12   your accident?

13       A.    Correct.   Yes.

14       Q.    What else did you do while standing on

15   the ladder before your accident --

16       A.    Well, I go about a foot over putting the

17   lights up and the ladder gave way.

18       Q.    Have you installed any clips before the

19   accident?

20       A.    Yes, I got about a foot of lights up,

21   roughly a foot.

22       Q.    At what intervals did you intend to put

23   those clips?   Would it have been every foot,

24   every two feet, every inch?   I mean I don't know.

Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 22

1    You tell me.

2        A.    The clips I think there was, I don't

3    know, stand every 5, 6 inches.  It's been almost

4    two years.  I can't honestly remember.

5        Q.    Would it be safe to say based on your

6    recollection that you had installed at least one

7    or two clips before your accident?

8        A.    Yes.

9        Q.    I take it that if you were able to

10   install the lights along the entire facade of the

11   garage that day that you would have had to have

12   come back down off the ladder and move the ladder

13   over as you worked your way down --

14       A.    Correct.

15       Q.    Had you reached the point where you had

16   to climb down and move the ladder over before

17   your accident?

18       A.    No, I did not.

19       Q.    What were you actually doing at the

20   moment of your accident?

21       A.    Putting lights up.  That's all I

22   remember.  It happened so quick.

23       Q.    Do you remember if you were actually

24   installing a clip, if you were pulling the string

Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 23

1  downward to install the next clip or do you just

2  not remember specifically?

3      A.   I do not remember.

4      Q.   At the moment of your accident, had you

5  actually stopped work for any reason, for

6  instance, to look at the lights or just stop to

7  take a breather or were you actually in the

8  process of continuing to install the clips?

9      A.   I was just doing the work and kept going

10  whatever I was doing.

11      Q.   So you have no recollection of stopping?

12      A.   Right.

13      Q.   What type of physical motion is required

14  to get those clips to slide in?

15      A.   Usually they're real thin.  If you go to

16  any hardware store that sells Christmas lights,

17  they just slide right in.  They're real thin and

18  just --

19      Q.   And do they slide in between the

20  underside of the fascia and the wall, the brick

21  wall, is that --

22      A.   No.  I was putting it on the lip of the

23  soffit and fascia.

24      Q.   So the outside --

1    A.    The fascia comes down like this and the

2    soffit sits in there, so I slide it right into

3    that.

4    Q.    Any difficulty doing that?

5    A.    No.

6    Q.    In terms of seconds or minutes, how long

7    were you on the ladder before your accident

8    happened approximately?

9    A.    Not that long because it don't take that

10   long to plug it in.  So I don't know, couple

11   minutes, five minutes.  I can't say any longer

12   than ten.  But I would say probably five because

13   I didn't get very far.

14   Q.    During the five minutes that you were on

15   the ladder before your accident, did the ladder

16   shake, wobble or feel unsteady?

17   A.    Not that I can recall.

18   Q.    During the five minutes that you were on

19   the ladder before your accident, did you have any

20   reason to believe that there was anything wrong

21   with that ladder?

22   A.    No, I did not.

23   Q.    During the five minutes that you were on

24   that ladder before your accident, did you feel

Case 1:08-cv-00164   Document 5-2   Filed 01/15/2008   Page 27 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-24-07)

Page 25

1  any movement of the ladder where it was twisting

2  or turning or anything like that?

3      A.   **Not that I can recall.**

4      Q.   During the five minutes that you were on

5  the ladder, did you have occasion to look down at

6  the feet of the ladder on the driveway?

7      A.   **Not that I recall.  I mean I checked the**

8  **ladder before I went up and didn't see any**

9  **reason.  If I was wobbly, I would have felt it**

10 **above, I believe, and got off.**

11     Q.   Did you feel anything or see anything

12 that gave you any reason to believe that the feet

13 of the ladder moved at all during the five

14 minutes you were on the ladder?

15     A.   **No.**

16     Q.   Did you see anything or feel anything

17 that gave you any reason to believe that the

18 ladder twisted or turned or moved at all while

19 you were on the ladder during that five minutes

20 before the accident?

21     A.   **No.**

22     Q.   What happened at the time of the

23 accident?

24     A.   **All I remember is all of a sudden, that**

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 28 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 26

1    ladder gave.  I put my hands out because I have a

2    pacemaker.  If I get hit in the chest, I'm 100

3    percent dependent on it.  If I break my wire, I'm

4    gone.  So I put my hands out.  And my wife was

5    around the corner with one of our daughters.  She

6    come over there and see me laying on the ground

7    and didn't know what happened.  I'm on the

8    ground.  She turns me over.  I was ghost white.

9    And she got me in the house after she finally got

10   me up, got me at the kitchen table at the chair.

11   And she went back out and said the ladder looked

12   like a pretzel, you know, like you saw it out

13   there.

14          And then got me to catch my breath and

15   got me to the acute center.  My main concern was

16   did I damage my pacemaker because the wires come

17   down like this.  I have x-rays in the office and

18   another one there.  I missed the pacemaker wire

19   by like that much because I came down here and I

20   banged on my ribs and broke both my wrists.  It

21   happened so quick my first instinct was you put

22   your hands out to protect you.

23       Q.   The ladder happened suddenly and without

24   -- I'm sorry, the accident happened suddenly and

1  without warning?

2      A.   As far as I recall, I don't remember any

3  warning of it.  I mean obviously something warned

4  me because I put my hands out.

5      Q.   Before the accident, did you hear any

6  noises?

7      A.   No.

8      Q.   Before the accident, did you see the

9  ladder twisting, turning or bending?

10     A.   I don't recall.  Something did

11 something.

12     Q.   But do you recall before the accident

13 actually seeing the ladder twisting, turning or

14 bending?

15     A.   No.

16     Q.   One second you were on the ladder and

17 the next thing you knew you were falling?

18     A.   Yes.

19     Q.   Before this accident, was this ladder in

20 any way, shape or form dented, bent or damaged?

21     A.   No.

22     Q.   All the damage that we see on the ladder

23 now and specifically the inward bends of both

24 front rails below the first step, that all came

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 30 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 28

1    about during your accident?

2        A.    Correct.

3        Q.    Do you remember if you were moving or

4    standing still at the moment of your accident?

5        A.    There's really no reason for me to move

6    much because I only got a foot on the lights.    I

7    don't know how to answer that one because --

8        Q.    So if you were moving, it would have

9    been --

10       A.    Basically just my arms.

11       Q.    -- your arms?

12             Were you using both arms to install the

13    lights or just one arm?

14       A.    I don't know.    I can't think of how you

15    would do it without doing it.

16       Q.    How were your feet positioned on the

17    fourth step of the ladder?    Were you standing off

18    to one side of the ladder or your feet kind of

19    centered on the fourth step?

20       A.    The way I'm about ladders, I'm sure my

21    feet are straight and like they were supposed to

22    be.

23       Q.    So they were equal distance from the

24    center of the step?

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 31 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 29

1      A.    Correct.

2      Q.    Do you remember if you had your feet

3    braced against the inside of the upright rails or

4    whether your feet were just freestanding on the

5    step?

6      A.    I do not remember.

7      Q.    Do you remember if your body was erect

8    or whether you were bending your knees and

9    leaning into the ladder or leaning to your right

10   or left?

11     A.    I could not tell you.  I don't know.

12     MR. BRYDGES:  I didn't hear what you said.

13     THE WITNESS:  Huh?

14     MR. BRYDGES:  I couldn't hear what you said.

15     THE WITNESS:  I just said I couldn't tell

16   you.  When things happen fast, you don't -- you

17   don't expect it to happen so you don't sit there

18   and look at every detail you are doing.

19   BY MR. PARSKY:

20     Q.    Direction wise, which direction did you

21   fall; to your right, to your left, forward,

22   backward, combination thereof?

23     A.    I honestly couldn't tell you because my

24   concern was protecting my chest.  You know, when

Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 30

1    you are falling, you are just thinking of

2    protecting yourself.  Some people roll up into a

3    ball, you know, if they can or.

4        Q.    Were you in contact with the ladder as

5    you fell?

6        A.    I know I landed on the ladder if that's

7    what you are asking.  That's what banged up my

8    ribs and almost got my pacemaker.  When my wife

9    found me, I was on top of the ladder basically

10   when I was laying on the ground.

11       Q.    I take it the ladder fell over during

12   the accident?

13       A.    Yes.

14       Q.    And I take it you have no recollection

15   as to which side the ladder fell on; its right

16   side, its left side, forward, backward?

17       A.    Well, it didn't fall against the house

18   so it would have to fall to the left, I would

19   think.

20       Q.    That would be away from the house?

21       A.    Yes.  Now, I'm guessing on that.  I

22   think that's the only way it could fall if you

23   have the building next to you.

24       Q.    When you fell, did you make contact with

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 33 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 31

1   any portion of the house?

2       A.   No, I did not.  I went straight down.

3       Q.   And after the accident, do you recall

4   one way or the other whether any portion of the

5   ladder was in contact with the house, and by that

6   I mean the side of the house, that brick

7   partition between the --

8       A.   I don't believe any ladder came in

9   contact, but I cannot 100 percent tell you yes or

10  no.

11      Q.   To protect yourself, you reached out

12  with both of your hands?

13      A.   Yes.  As I -- all I remember is -- the

14  only thing I remember is seeing that ground come

15  real quick and I put my hands out.  There wasn't

16  much time to do that because I wasn't that high

17  up in the air.  I put my hands out.  The only

18  thing that makes sense to me is my hands hit the

19  black top, my chest hit the ladder side.

20      Q.   Do you recall that your hands hit the

21  black top or did your hands hit the ladder or

22  don't you recall?

23      A.   I really can't recall.  I'm just

24  guessing.

1      Q.    But your hands hit something because you

2   had --

3      A.    Fractured both wrists.

4      Q.    -- fractured both wrists, okay.

5            What type of rib injuries did you have?

6      A.    Badly bruised.   They were not fractured.

7      Q.    And that was from striking the ladder?

8      A.    Yes.

9      Q.    Your wife was the first person to attend

10   to you after the accident?

11     A.    My wife and my one daughter.

12     Q.    And what's your daughter's name?

13     A.    Samantha.

14     Q.    And they were right around the corner?

15     A.    They were around on that outside wall of

16   the garage where they couldn't see nothing

17   happen.   They were putting lights on the bushes.

18     Q.    So Samantha and your wife didn't

19   actually see the accident, but they may have

20   heard something and they were there right

21   afterwards?

22     A.    I honestly don't think they even heard.

23   They just came around and saw me laying there.

24     Q.    Okay.

Page 33

1      A.    If I remember right.

2      Q.    So Samantha and your wife didn't see the

3    accident?

4      A.    No, they did not.

5      Q.    After the accident, at some point you

6    took a look at the ladder; is that correct?

7      A.    Yeah.  Once they got me breathing right

8    and stuff like that.  When we went to the

9    emergency thing, my wife pulled in the garage and

10   we left.  I saw it then and it gave me chills

11   when I saw it.

12     Q.    Was this before you went to the

13   emergency care unit?

14     A.    I saw it, yeah.  And then I saw it when

15   we came home obviously.

16     Q.    When you had a chance to take a good

17   look at the ladder after the accident already

18   happened, what damage did you see?

19     A.    I saw the legs bent and the bottom --

20   and the bottom step was up like a triangle

21   basically.  I was trying to figure out how that

22   happened.

23     Q.    Is it accurate to say that the first

24   time you saw that the legs were bent inward below

Case 1:08-cv-00164   Document 5-2   Filed 01/15/2008   Page 36 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 34

1    the first step and that the first step was bent

2    upward -- strike that.  Let me rephrase that.

3              Is it accurate to say the first time you

4    saw that the ladder was damaged where the rails

5    were bent below the first step and the first step

6    was bent upward after your accident?

7        A.    That the first time I saw it was after?

8    Yes.

9        Q.    Yes.  You didn't actually see the legs

10   bent and the step bent upward during your

11   accident, did you?

12       A.    No.

13       Q.    Did you see any other damage on the

14   ladder after the accident that you attribute to

15   the accident other than the front rails being

16   bent below the first step and the first step

17   being bent upward?

18       A.    The only damage I saw was the bottom of

19   the ladder.

20       Q.    Is that the damage that you believe was

21   involved in your accident?

22       A.    Yes.

23       Q.    Where did you go for medical treatment

24   after the accident?

Case 1:08-cv-00164   Document 5-2   Filed 01/15/2008   Page 37 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 05-21-07)

Page 35

1    A.    Condell.   I think it's called Condell

2    Acute Center on Grand Avenue in Gurnee, just west

3    of the tollway.

4    Q.    That's an acute care center as opposed

5    to an emergency room; is that correct?

6    A.    Yes.

7    Q.    What treatment did you get there?

8    A.    X-rays of my ribs, my pacemaker, make

9    sure that there's no damage to the wires.  And

10   then they x-rayed both my arms and wrists, hands.

11   Q.    How soon after your accident did you go

12   to the Condell Acute Care Center?

13   A.    Say within an hour I was there.  That's

14   a rough guess.  I mean, I was in so much pain.

15   You know, things happen and we have three kids,

16   and we are trying to -- I mean, I wasn't bleeding

17   so you know.  Kids going and --

18   Q.    When you went to the Condell Acute Care

19   Center, did the medical personnel there ask you

20   what happened, how you were injured?

21   A.    I'm sure they would have.  I can't

22   remember for sure if they did or not.

23   Q.    Do you remember providing them with a

24   history?  In other words, they said how did you

Page 36

1    hurt yourself?

2         A.    Well, I'm sure I told them the ladder

3    collapsed when I was hanging Christmas lights.

4         Q.    How did you get to the Condell Acute

5    Care Center?

6         A.    My wife drove.

7         Q.    So there's no ambulance involved?

8         A.    No.

9         Q.    After the folks at the Condell Acute

10   Care Center took the x-rays of your ribs and arms

11   and wrists, what happened next?  Did they let you

12   go home?

13        A.    Yes.  We were there for several hours.

14   They took x-rays for some reason.  And the doctor

15   comes in and says your right one is fractured,

16   your left one fractured real bad.  He put -- he

17   did put -- I don't think a faux cast on the right

18   ones because he wanted me to go right to the

19   doctor on Monday, the regular doctor, which is

20   Dr. Martin Fetter.  But they cast me up on both

21   wrists, couldn't really do much for the ribs.

22             He also told me at the acute center to

23   go to the heart doctor.  Here's your x-rays.  I

24   took the x-rays with me and got a copy here to

Case 1:08-cv-00164   Document 5-2   Filed 01/15/2008   Page 39 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 37

1   make sure I didn't damage anything with my

2   pacemaker.  But from everything they could tell,

3   they said it looks like it was fine.  But they

4   still had to run the series of tests on my heart

5   and pacemaker.

6        Q.   Did you ever have any surgery for your

7   fractured wrist?

8        A.   I had a surgery -- something developed

9   in my thumb.  And they're saying maybe it was

10  probably from the trauma, the fall.  It turned

11  into some type of blood vessel tumor thing or it

12  was some weird name.  It was eating away at the

13  bone.  They cut that to make sure it was not

14  something else.  So they wrote it up as a trauma

15  thing.  They did that last fall, the surgery.

16  You could see the scar right here on the thumb.

17  I don't know if you could see it or not, but it's

18  here.

19       Q.   That's your right thumb?

20       A.   Yes.

21       Q.   How long after the accident did you

22  notice this mass on your right thumb?

23       A.   I could look back.  I don't know.  Look

24  on the doctor's records.  I couldn't tell you.

1      Q.    Was it more than a year?

2      A.    More than a year after that?

3      Q.    The accident.

4      A.    No.  No, because they cut it out.  I

5    think it was in the fall they cut it out.  So

6    that would have been -- it happened in December,

7    and in the fall last year was on the year.  So

8    less than a year.

9      Q.    It would have been more than four months

10   until you noticed the mass on your --

11     A.    Yeah, I'm sure it was.

12     Q.    -- right thumb?

13           Which doctor told you that the mass on

14   your right thumb was attributable to your ladder

15   accident?

16     A.    Well, they didn't know that.  They

17   didn't know what it was until they cut it out to

18   see what it was.  They took some whatever type of

19   x-rays to see what was going on.  They saw there

20   was some bone damage going on.  And they cut it

21   out.  They said that bone come back once it was

22   -- whatever medical names they were calling it.

23   It would come back and straighten out the bone.

24   And they wrote it off as a blood vessel something

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 41 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 39

1    or other.

2        Q.    Did the doctors say one way or the other

3    whether the mass on your right thumb was

4    attributable to your ladder accident or not or

5    weren't they sure?

6        A.    **They believe it was from the trauma of**

7    **the fall.**

8        Q.    Which doctor told you that?

9        A.    **Fetter.**

10       Q.    Could you spell that?

11       A.    **F-e-t-t-e-r, Martin Fetter.**

12       Q.    Is he local?

13       A.    **He's in Gurnee.**

14       Q.    Did you have any surgery on either of

15   your wrists as a result of this accident?

16       A.    **No, I did not.  Just what do you call**

17   **it, therapy.**

18       Q.    Physical therapy?

19       A.    **Yes.**

20       Q.    Are you done with physical therapy for

21   your wrist?

22       A.    **I know my last one and my wrist really**

23   **started hurting so they said I needed to go back**

24   **when it hurt.  When it was cold last week, I**

Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 40

1    started feeling the left one real bad.  You know,

2    it started aching in -- the right ached when I

3    used it for stuff.  But the left one would just

4    ache on its own right through here.

5        Q.    Was there a point in time where you

6    completed your course of physical therapy and

7    they said, okay, you don't have to come back

8    unless you feel that you need to?

9        A.    I'm trying to remember what they said.

10   All I know is Dr. Fetter, what do you call it,

11   prescribed me to go back to the last one.

12       MR. BRYDGES:  By the way, I have $13,000 in

13   physical therapy bills that I didn't send.  I'll

14   mail those to you, mail copies to you.

15   BY MR. PARSKY:

16       Q.    At some point were you discharged from

17   physical therapy where they said you don't have

18   to come back unless you want to?

19       A.    No.  No.  They said I was doing good.  I

20   don't remember exactly what they said.  They did

21   basically say, you know, come back if you need

22   to.

23       Q.    When was that?

24       A.    Last time I was there.

Case 1:08-cv-00164   Document 5-2   Filed 01/15/2008   Page 43 of 54

Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 41

1       Q.    When was that?

2       A.    I have to look at the dates.  I can't

3   remember.

4       Q.    Was it more than a month ago?

5       A.    Oh, yeah.

6       Q.    More than six months ago?

7       A.    Yeah.  Dr. Fetter was prescribing me to

8   go back there more last winter.

9       Q.    Did you go back last winter?

10      A.    It started feeling a little better and

11  then it ached again.  So I said, you know what, I

12  will just deal with it for now.  And then now I'm

13  wondering if I should have gone back because it

14  was hurting last week when it was cold out.

15      Q.    So when Dr. Fetter told you you should

16  go back to physical therapy last winter, you

17  thought about it and you thought, well, I'm not

18  going to do it and you didn't go back; is that

19  correct?

20      A.    Yes.

21      Q.    When is the last time you saw Dr. Fetter

22  about anything related to the ladder accident?

23      A.    I don't remember.  Six months ago maybe,

24  four months ago.  I can't 100 percent guarantee

Page 42

1    how many months ago it was.   I made a follow-up

2    with him with my thumb surgery, wrist.   And it

3    might have been five months ago.   It could have

4    been six.   It could have been seven.

5        Q.   The last time you saw Dr. Fetter, did he

6    tell you that there was no need to schedule an

7    appointment but you should call him if you felt

8    like you needed to come back?   Is that how it was

9    left or you have an appointment with him?

10       A.   No, I don't have no appointment with

11   him.   He -- I always -- I always -- when I go --

12   with doctors, if I need to go, I go, you know.

13       Q.   Do you have any pending doctors

14   appointments regarding anything having to do with

15   your ladder accident?

16       A.   No, I do not.

17       Q.   Is the last doctor's appointment

18   regarding anything having to do with your ladder

19   accident the one with Dr. Fetter approximately

20   five months ago?

21       A.   Yes.

22       Q.   How were your wrists immobilized

23   following the accident?

24       A.   Casts up to here on both hands.   This

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 45 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 43

1    one was a permanent cast.  This one was a cast

2    that was -- I think you were able to take it --

3    yeah, you were able to take it off if you had to.

4    It gave me a little more movement in my fingers.

5    This one was pretty much never coming off until

6    it was ready to come off.

7         Q.   So you had a plaster cast on your left

8    wrist and then sort of a splint, removable

9    splint, on your right --

10        A.   Well it was a half a cast I believe is

11   what they called it.

12        Q.   Both of those casts were below the

13   elbow?

14        A.   Yes.

15        Q.   So you could bend --

16        A.   Oh, you know, I take that back.  For

17   awhile, this one was above the elbow.

18        Q.   This one being your left arm?

19        A.   Yeah.  It was up to like here.  And the

20   reasons I do not remember why if he even told me

21   why it was.

22        Q.   Are you right handed or left handed?

23        A.   I'm right handed.

24        Q.   How long did you wear the hard cast on

1    your left arm, the one above your elbow?

2        A.    I honestly can't remember.

3        Q.    More than a month?

4        A.    What's that?

5        Q.    More than a month?

6        A.    Yes.

7        Q.    More than two months?

8        A.    I know he cut the cast off -- cut off

9    both hands and then did x-rays and put them back

10   on.  I cannot remember or recall the time period

11   that was.

12       Q.    Is it safe to say that it would have

13   been five months after your accident you were no

14   longer wearing casts on your arms?

15       A.    Correct.

16       Q.    Have you incurred any work related loss

17   as a result of the ladder accident?

18       A.    Yes.

19       Q.    Please describe it.

20       A.    Well, first of all, I couldn't go out to

21   job sites if they are not smooth because I had to

22   protect my chest.  You know, I'm paranoid of

23   that.  I had a pacemaker put in two years ago.

24   They told me don't get hit in the chest.  So now

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 47 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 45

1    my hands were being casted and stuff, I was

2    afraid to go on the job sites.  I can't climb up

3    to the levels.  So because if it was winter time,

4    I pretty much shut down.  With jobs that were

5    almost done got finished and I really didn't

6    start nothing.

7            And in the wintertime, I always usually

8    start about five to six houses and the market was

9    still halfway decent.  And I didn't take any

10   remodeling jobs during that time.

11       Q.    What was your role on these jobs?  And

12   I'm talking about both the remodeling jobs and

13   the new construction jobs?

14       A.    I would do spec houses for myself.  I

15   would start other paperworks, loans, from start

16   to finish being on the job sites, help staking

17   them out.  You know, because -- you know, make

18   sure the foundation goes where it's at, get the

19   house started from start to finish, make myself a

20   general's fee and sell the house and make a

21   profit.

22       Q.    I take it you don't do any -- strike

23   that.

24            You didn't do any of the hands on labor?

Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 46

1      A.    Some stuff I will.  I would help with

2  some of the trimming, you know, minor stuff,

3  nothing with real heavy, you know, duty stuff,

4  but I would help putting trim in.

5      Q.    Principally you had contractors --

6      A.    Yes.

7      Q.    -- do the hands on labor?

8      A.    Right.  But because we changed things

9  several times and rough framing, no stairs

10  getting in, I wasn't going up no ladder plus I

11  was scared of ladders for quite awhile.

12      Q.    How soon after the accident were you

13  back full-time doing everything you were doing

14  with your business before the ladder accident?

15      A.    Once the ground was not real soft where

16  you sink in because like I said I'm paranoid of

17  hitting my chest.  I mean the pacemaker was new

18  to me.  I had a pacemaker put in in August right

19  before the accident.  So they tell me block your

20  chest, don't -- you know, so you are paranoid,

21  you know, when you do this stuff.

22      Q.    How many months after your ladder

23  accident?

24      A.    Say December the accident was, I would

Case 1:08-cv-00164    Document 5-2    Filed 01/15/2008    Page 49 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09-21-07)

Page 47

1    probably say I didn't really feel comfortable

2    going on job sites until May because the ground

3    is saturated with snow and soft.  There's no

4    smooth ground to walk on.

5        Q.   So by May of 2006, you were back to

6    doing pretty much everything you were doing

7    before the ladder accident?

8        A.   Except for any actual type of trimming

9    or minimum work on it.

10       Q.   Have you quantified any financial loss

11   that you incurred as a result of you not doing

12   what you had done before the ladder accident from

13   the date of the accident until May of '06?

14       A.   Yeah.  It takes me about three months to

15   build a house.  I lost about five to six houses.

16       Q.   Did you still build the houses?

17       A.   No.

18       Q.   Why not?

19       A.   Because I like to do my own stuff.  I

20   mean, I like being involved.  That way I know

21   it's done right.

22       Q.   Those houses were never built?

23       A.   The market started getting bad after

24   that so I slowed down after that.  The market was

1  still good basically up through that summer and

2  then after that, I usually did from anywhere from

3  10 to 20 houses a year.  In '06 -- I mean, '05,

4  brand new ground break in -- because you always

5  try to break ground in the 1st of January and get

6  the foundations in before mid February and get

7  the house decked so snow stays out.  Because of

8  the injury, I didn't get those houses started,

9  you know, ready for spring sale.

10       Q.   Your accident took place in December

11  of 2005 and you said that you finished up the

12  houses that were --

13       A.   No.  I mean, there was probably some

14  minor houses that, you know, where they were

15  putting in carpet in and stuff.  Like I said, I

16  always try to break ground before February if you

17  could if your house is -- so I had work going on

18  through -- the houses are ready for spring and

19  summer.

20       Q.   How many houses did you do in 2006?

21       A.   Not that many.  I have to look at my

22  records.  I could get back to you on that.

23       Q.   Were some of the -- strike that.

24            If the numbers went down in 2006 in

Case 1:08-cv-00164   Document 5-2   Filed 01/15/2008   Page 51 of 54
Drobnick vs. Tricam Industries (Recorded statement of Jeffery Drobnick, taken 09/21/07)

Page 49

1    terms of the number of houses that you did, would

2    some of that have been attributable to market

3    conditions?

4         A.   No, because it depends what type of

5    house you are building.  I was set to build

6    several cheaper homes or less costly homes I

7    should say in the town of North Chicago.  Those

8    houses always sell because of the price range.

9              Now, the houses are, you know, over 300,

10   that's what's really hurting the market.  But you

11   got houses that are priced right, they were fine

12   until just recently.  You know, with the interest

13   rates, you know, it would be harder to finance.

14   I'm sure you guys watch all of that though.

15             Like I said, I was selling the houses

16   faster than I could build them in

17   North Chicago.

18        Q.   I guess what I still don't think I have

19   a handle on is why didn't you just start these

20   houses in May of 2006?

21        A.   I mean but still I started in May of

22   2006 -- I mean, I did start other houses, but my

23   usual amount of houses I didn't start.  So I

24   didn't start them in February because it was

1   getting too cold.  You don't want to do

2   foundations in February.  You want to get them in

3   before the cold.  I won't start a foundation

4   unless the weather is unusual.

5        In May, I just basically went right back

6   to work in my normal schedule.  It threw me off

7   the schedule five or six houses because I had

8   several lots I couldn't build on in

9   North Chicago.

10   Q.   Is it accurate to say you have not

11   quantified any business loss that you incurred as

12   a result of the ladder accident?  In other words,

13   you don't have a number for me today?

14   A.   Not today.  I have to put down and come

15   up with what I sold houses for and what my profit

16   range is.  I could tell you right now what I pay

17   myself in general fees for a house, but then my

18   profits on the North Chicago house were from 35

19   to 55 and then plus my generaling fee.  It all

20   depends how quickly it sells.

21        And I think the lowest I made down there

22   is 35 on a house, the last one I just sold down

23   there.  And then plus my generaling fee, I pay

24   myself a generaling fee during construction so

1    it's income for me to pay my bills.  You know, I

2    pay myself 20, 25,000 per house for a generaling

3    fee.

4         Q.    So you don't have a number today?

5         A.    No.

6         Q.    Has this accident affected your heart

7    condition at all?

8         A.    Not that I'm aware of.

9         MR. PARSKY:  Okay.  I think that's all I

10   have.

11                      (Whereupon, which were

12                      all proceedings recorded on

13                      said date and said time.)

14

15

16

17

18

19

20

21

22

23

24

Case 1:08-cv-00164   Document 5-2   Filed 01/15/2008   Page 25-47 of 54

Drobnick vs. Trican Industries (Recorded statement of Jeffery Drobnick, taken 9/25/07)

Page 52

```
 1    STATE OF ILLINOIS )
                        )   SS:
 2
      COUNTY OF C O O K )
 3

 4

 5         Marlo Rodriguez, being first duly sworn,

 6    on oath says that she is a court reporter doing

 7    business in the City of Chicago; and that she

 8    transcribed the proceedings of said recorded

 9    statement, and that the foregoing is a true and

10    correct transcript of her shorthand notes so

11    taken as aforesaid, and contains the proceedings

12    given at said recorded statement.

13

14    _____

15            Certified Shorthand Reporter

16

17    SUBSCRIBED AND SWORN TO

18    before me this  7th  day

19    of  January      2008.

20

21

22    _____

23            Notary Public

24
```

OFFICIAL SEAL
KAREN M KACZMAREK
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/03/11